R. W. MILLSAPS *v.* MERCHANTS' & PLANTERS' BANK OF GREEN-
VILLE.

1. SALE. *Corporate stock. Warranty as to debts. Evidence. Admission.*

In an action on a note given to the sole owner of stock of certain corpo-
rations for the purchase of an interest therein, where the seller had war-
ranted that their aggregate liabilities did not exceed a fixed sum, on the
inquiry whether certain debts were corporate or individual debts, an
unsigned memorandum of the corporate liabilities, furnished by the
seller as a basis for the negotiation, is admissible in evidence, as tending
to show an admission by the seller that the debts listed therein were cor-
porate debts.

2. SAME. *Contract of sale. Construction. Intention of parties.*

Although certain debts listed in the memorandum, and outstanding when
the sale was completed, contracted for the benefit of the corporations,
were not legally binding on them, they should be treated, as between
purchaser and seller, as corporate liabilities within the contemplation
of the contract, and should be considered in determining whether such
liabilities exceeded the amount warranted.

3. SALE.  *Character of debt.  Who may question.*

> And so a debt not in said list, created in the name of one of the corpora-
> tions by such sole owner of the stock, and outstanding at the time of the
> sale, should be treated as a corporate debt within the meaning of said
> contract, notwithstanding the consideration was received by such sole
> owner individually.  No one not a creditor of the corporation could
> complain.

4. EVIDENCE.  *Parol to vary writing.  Consideration.*

> Although said memorandum was given pending negotiations which were
> merged in a written contract to sell, it is not subject to the rule exclud-
> ing contemporaneous parol evidence to vary a written contract, since it
> only attacks the consideration—that is, the margin of value between the
> total worth of the corporations and their aggregated liabilities, the real
> subject of the sale.  *Cocke* v. *Blackburn,* 57 Miss., 689.

.5. CONTRACT.  *Consideration.  Reference to other writing.  Evidence.*

> Where a contract of sale recites that it was made in accordance with a pre-
> vious written contract to sell, to which reference is made, the former
> contract is not abandoned, and a memorandum throwing light on its
> consideration may be looked to in explanation of the later contract.

6. SAME.  *Assets, whether corporate or individual.  Intent.  Incumbrance.*

> Where the sole owner of the stock of certain corporations sells an interest
> therein, warranting that their liabilities do not exceed a fixed sum, land
> listed by him in negotiating the sale as corporate assets will be treated
> as such, though held in his individual name, and a mortgage thereon
> should be considered in determining the margin between the value of
> the corporate assets and the liabilities.

7. PROMISSORY NOTE.  *Representations by assignor.  Evidence.  Code* 1880, ¿ 1124.

> Under our statute, in an action by the assignee of a note against the maker,
> admissions or representations made by the payee as an inducement to
> its execution, are admissible as against the assignee.  Code 1892, ¿ 3503;
> *Brown* v. *McGraw,* 12 Smed. & M., 267.

8. SALE.  *Warranty.  Breach.  Remedy of purchaser.  Rescission*

> Where a contract of sale of an interest in corporate stock warrants that
> the corporate debts shall not exceed a fixed amount at a given time, at
> which the sale is to be completed and the price paid, the warranty is
> broken if the debts then exceed the amount named, and the purchaser,
> who has received nothing under his purchase, can repudiate the contract
> entirely, even though the seller, after breach and before suit, shall have
> reduced the debts within the margin.

9. PROMISSORY NOTE. *Given for negotiation. Defense against assignee. Estoppel.*
　　The fact that a note was executed for the purpose of being negotiated, and
　　that it was so negotiated, does not take it out of the operation of our
　　anti-commercial statute, code 1880, § 1124, which allows to the maker
　　any defense against an assignee or indorsee had before notice of the as-
　　signment. To have that effect, there must be such a sinister design as
　　would create an estoppel. *Hawkins* v. *Neal*, 60 Miss., 256, distinguished.

FROM the circuit court of the first district of Hinds county.
HON. J. B. CHRISMAN, Judge.
The case is stated in the opinion.

*Nugent & Mc Willie*, for appellant.

1. It was error to exclude the unsigned memorandum of liabilities. It was an admission that the debts were corporate liabilities. Besides, it formed the basis of the negotiation.

2. The real inquiry was, what was the margin of value between the corporate assets and liabilities? Whether a debt was legally the debt of the corporation or not, if it was treated as such in the negotiation, it should be considered in determining the amount of the corporate liabilities.

3. It was error to refuse leave, on the trial, to file an additional plea that certain property, treated as corporate property in the negotiation, was incumbered. As the margin of value was the thing sold, it would be destroyed either by increasing the debts or diminishing the assets. It is no answer to say that the incumbrances were for the private debts of Johnson. He was the sole owner of the stock, and no one not a creditor of the corporation could complain. Surely the appellee, who stands in Johnson's shoes, cannot occupy a better position than he did.

4. The warranty having been broken when made, subsequent payment of debts by Johnson could not cure the breach. 3 W. & M., 529; 35 Ind., 475; 3 Gray, 580; 1 Allen, 305; *Toxoda* v. *Camp*, Walker (Miss.), 150.

*Calhoon & Green*, for appellee.

1. The defense is in the nature of a recoupment for damages for breach of a warranty. As Johnson paid off all the excess of the debts before the time for consolidating the railroads, Millsaps sustained no damages. Although there may be a breach of warranty as soon as made, the subsequent performance cured the breach, just as the acquisition of the outstanding title by the grantor cures a breach of warranty of title.

2. On the point that the note was given for negotiation, we submit that the replication falls within *Hawkins* v. *Neal*, 60 Miss., 257 ; *Mandeville* v. *Bank*, 9 Cranch, 9.

3. Millsaps bought capital stock, not property. The sole warranty was as to the consolidated corporate debts. The July contract does not refer to existing debts, but guarantees that the total debts shall not exceed the sum stated. For this reason, the memorandum of liabilities was properly excluded. The contract itself was the only evidence of the price of the stock. The elements that went to make up the price were immaterial. The bases for negotiation, whether by colloquium or written, are all merged in the contract.

4. It was proper to refuse leave to amend on the trial. It was too late. Besides, to have gone into the question of what properties the companies owned would have been to try a case never suggested. There was no warranty as to property. The July contract differed from that of September. The latter contained a warranty as to then existing liabilities, and an undivided interest in stock was bought, subject to the pledge to Gunn. Hence, the negotiations leading to the former contract were irrelevant. It is evident that Millsaps did not accept Johnson's representations as to the debts, since he took a guaranty that the aggregate did not exceed a fixed sum. The criterion as to the existence of corporate debts was, *in respect to time*, September 20 ; in respect to the character of debts, that they should be corporate. The memorandum merely showed what debts John-

son expected to be paid; but Millsaps had the right to reject any not corporate. The memorandum was not an admission that the debts were corporate.

5. If any of the debts were not corporate, Johnson had no power to use the corporate property to pay them. Johnson was not the owner of the roads, but of corporate stock. Millsaps, by his purchase, became a stockholder, and Johnson could not devote corporate property to pay his own debts. Any such contract was void. Field on Corp., §§ 173, 174. Even the assumption of such a debt by mortgaging the corporate property to secure it, could not bind the corporation. Such a mortgage debt would not be a corporate liability.

Argued orally by *W. L. Nugent*, for appellant, and *M. Green*, for appellee.

MAYES, Special J., delivered the opinion of the court.

This is an action on a promissory note for $2,916.67, executed by the appellant to the order of Harry K. Johnson, and by said Johnson indorsed in blank, and transferred to the appellee before maturity. The note was given as part of a contract between the parties thereto, of date twentieth of September, 1890. That contract is set forth in full in the opinion of this court, rendered on the former appeal in this case, and reported in 69 Miss., 918.

Construing that contract, we held that, looking through the mere verbiage of the transaction to its real substance, what Johnson sold and Millsaps bought was one-third in a margin of value between the worth of all the property of all the street railways, placed at $45,450, and the sum of all their debts, warranted not to exceed $36,700 on the twentieth of September, 1890; that the fifth plea of the defendant, which averred that the debts of the said companies in fact amounted at that time to $44,825, and perhaps more, was good, because it in effect alleged the non-existence of the very thing bought and sold, to wit; the margin.

The case was therefore sent back for a new trial. On this second trial the court below again gave a peremptory instruction for the plaintiff, and this appeal seeks a reversal of that action. The course of the trial was such as to render necessary herein a statement of all the material facts of the case.

In the town of Greenville were four distinct street railways —the Greenville Street Railway, the Greenville Electric Street Railway and Power Company, the Star Line Street Railway and the Suburban Street Railway. Johnson was sole owner of all these concerns, except that about one-tenth of the stock of the Greenville Street Railway was outstanding in other hands. No stock had been actually issued by any of the companies except the last named. On the twenty-second of July, 1890, Johnson and Millsaps made the following written contract:

"This agreement witnesses that Harry K. Johnson sells to R. W. Millsaps a one-third interest in the stock of the Greenville Street Railway Company, of Greenville, Mississippi, held by Harry K. Johnson, being twenty-two thousand six hundred dollars, face value, a total capital stock of twenty-five thousand dollars, and also a one-third interest in the total capital stock of the Suburban Railway Company, and a one-third interest in a total capital stock of the Greenville Electric Street Railway and Power Company, and a one-third interest in the total capital stock of the Star Line Street Railway Company, of Greenville, Mississippi, for a total price of fifteen thousand one hundred and fifty dollars, and the said Harry K. Johnson guarantees that the total indebtedness of whatsoever kind of all of said roads shall not exceed thirty-six thousand seven hundred dollars on the twentieth day of September, 1890, and that he will deliver said stock on the twentieth day of September, 1890, and the said R. W. Millsaps agrees to pay for said interest said sum of fifteen thousand one hundred and fifty dollars to said Harry K. Johnson on the twentieth day of September, 1890, and said Johnson shall bear all expenses and take all profits from said

roads up to said twentieth day of September, 1890. The price above agreed to be paid by said Millsaps represents one-third of a total capitalization of all of said roads of forty-seven thousand eight hundred and forty dollars, and from the price to be paid by him is to be deducted the one-third of the indebtedness of all of said roads, above guaranteed not to exceed the first sum above named.

" Witness our signatures, this twenty-second day of July, 1890.                                   " HARRY K. JOHNSON,
                                                " R. W. MILLSAPS."

The plan was that the $36,700 of debts were to be settled by placing a consolidated bonded mortgage on the entire property of the railways, which were also to be consolidated, and by taking up the debts with those bonds or their proceeds.

While this bargain was negotiating, and, as is claimed by Millsaps, " as the basis for the negotiation," Johnson gave to Millsaps certain unsigned memoranda of assets and liabilities. In the list of assets appear these two items: " Four lots, Belle Air, $3,000; sixteen lots, Park Side, $8,000." The list of liabilities aggregates $36,700, and in it appear these items: " Wilczinski note, $4,000; Dr. Walker, $1,100; Deaton & Skinner, $1,500." These memoranda Millsaps retained.

It seems that the stock in the Greenville Street Railway had been purchased by Johnson, on a credit, from one Gunn; that Johnson still owed some $19,000 of the purchase-money, and the stock was held in pledge to secure the payment of that debt. For this reason, when the twentieth day of September arrived, Johnson, not having the stock certificates in possession, and not being able to pay the debt to Gunn, could not deliver the stock according to his contract. Millsaps waived that point, and the written supplementary contract which is set forth in the former opinion of this court was made. Millsaps executed the note sued on, in purchase of one-third of the margin, making the same payable in sixty days, by which time it was understood that the bonds could

be prepared, the mortgage executed, and all of the $36,700 of liabilities, including the Gunn debt, which was listed as one of the debts, could thereby be liquidated, and the enterprise put on a substantial basis, and all of the roads be then consolidated.

There is a controversy between the parties as to the motives which led Millsaps to execute this note instead of paying the money on the twentieth of September. Millsaps claims that he did so for the reason that he saw that Johnson was not ready to deliver the stock as he had contracted to do, and, while willing to give him time to do so, he was determined not to pay for the stock until he got it. Johnson, on the other hand, says that Millsaps gave the note because he had other uses for his money, and that he, Johnson, granted him time for his accommodation, being moved to do so only because, on inquiry of the plaintiff, he found that the plaintiff would discount Millsaps' note, and that Millsaps knew this fact, and gave the note in order that the plaintiff might discount it accordingly. Millsaps claims to have known nothing of the assignment of the note to the plaintiff until the fifteenth of November, five days before its maturity, when he was notified.

On the twentieth of November, the day of the note's maturity, the bonds were still not quite ready; but on that day Mr. Gunn enjoined the mortgaging of the Greenville Street Railway, the sale of its property, or sale of the stock therein, except on condition that the proceeds of the mortgage should be paid to himself, etc. This injunction caused the whole negotiation to collapse; "the bottom dropped out," and Millsaps refused to pay the note unless the stock certificates accompanied it. This suit was then brought by the assignee of the note.

On the second trial, from which this appeal was taken, the condition of the pleadings was such that the principal issue of fact was on the question of whether the sum of all the corporate debts did or did not exceed $36,700. It was finally

admitted by the plaintiff that on the twentieth of September the corporate debts, the items of which were specified, aggregated the sum of $34,256.45, but defendant claims that, in addition, the following were debts of one or the other of the railways within contemplation of the contract: Starling & Smith, barge item, $85; Wilczinski note, $3,800; Deaton & Skinner, $1,500; Mrs. Blanton, or Dr. Walker, $1,100; Miller, Alexander & Co., $3,000; Campbell & Starling, $250; building and savings debt, $4,853.35. Of these items, the Wilczinski debt, the Blanton debt and the Deaton & Skinner debt were included in the list of liabilities made in July, but the others were not.

The defendant offered in evidence, for the purpose of showing that those three items were corporate debts, the list of liabilities aforesaid, but the court excluded it, and this action is excepted to. The objections made by counsel, in their argument, to the admission of this memorandum rest upon five principal propositions.

First, it is said that the memorandum was not in fact a memorandum of the liabilities of the corporations, but was only a list of such debts as Johnson would require to be liquidated by the consolidated mortgage, and since he was the owner and the seller he had a right to place therein his own individual liabilities—even his wash bills if he chose— without wrong to Millsaps. So far as the question of right is concerned, this is no doubt correct; but is it a fact? The list of debts, whether those of Johnson or of the corporations, or of some of each class, is exactly $36,700. The contract of July twice expressly speaks of a liability of the companies, guaranteed not to exceed that precise sum; and Mr. Starling stated that the memorandum was made for a basis of the negotiation between Millsaps and Johnson, as indicating liability to be *discharged* (by the mortgage, as we understand it, and as counsel in their argument claim), thus negativing the idea that it was an individual liability to be assumed by the companies in their consolidation. Looking

to the entire testimony in the case, we are satisfied that the list was offered for the purpose of proving an admission by Johnson of corporate liabilities as of date July 22, and we think it tended to do so. The weight of it was another question, but that was for the jury.

Secondly, it is said that the list was not a part of the contract of July, but was only part of the colloquium which preceded it, and was therefore merged in or displaced by it, the contract itself being the sole evidence admissible. Of course we recognize the rule insisted on in our previous decision, that parol contemporaneous testimony cannot be received to add to, alter or vary the terms of a written instrument; but while that rule excludes evidence in respect to the intention of the parties, it does not apply in this instance. Here the substantial question, although not presented in the simplest and most direct form by the pleadings, is one of consideration—that is, of the existence of the margin bought and sold—and the case is fully within the rule declared by this court in *Cocke* v. *Blackbourn*, 57 Miss., 689.

Thirdly, that the warranty in the contract of July looked to no specific debts, but only to the amount of the general sum, to be computed on the twentieth of September, and which might be composed of any corporate debts, whether existing on the twenty-second of July or not. We agree to that; but the question here is, not whether the debts existing on the twenty-second of July were the same debts which existed on the twentieth of September, but only whether a certain debt, or several certain debts, shown to have been owing both on the one day and the other, was or were corporate debts. The list was offered for that purpose, and not to show that the debts were different on one day from what they were on the other.

Fourthly, it is claimed that the contract of July was abandoned by the execution of that of September, and therefore that any basis of negotiation for the July contract fell with the contract itself. But we do not think that the July con-

tract was so abandoned. On the contrary, the September contract expressly declares that "this sale is made in accordance with" the contract of July, and that "reference is hereby made to it."

Fifthly, it is also claimed that Johnson's admissions do not bind the plaintiff. It was an admission or representation made in inducing the contract; and while it may not raise an estoppel (on which point we do not pass), it is competent against a subsequent assignee, the common law rule being changed by our statute. *Brown* v. *McGraw*, 12 Smed. & M., 267.

The Wilczinski debt, that of Mrs. Blanton (or Dr. Walker) and that of Deaton & Skinner were listed in July, in the memorandum aforesaid, as liabilities of the companies, or, at all events, as liabilities to be provided for in the proposed consolidated mortgage. We hold that they were clearly referred to by the contract of July, not, as we said above, that they were so specifically fixed upon as that, whenever the parties should come to execute the mortgage, Millsaps, in order to increase the margin purchased, could refuse to allow it to be given to the extent of $36,700 in case Johnson had extinguished any or all of these debts, or refuse to allow other and distinct liabilities, either of the corporations or of Johnson individually, to go in, on the ground that they had not been listed. He had no such right. But that is a proposition different from the true question, which is, whether, if those debts continued to exist, as they did so continue, Millsaps had the right, when the mortgage should come to be issued, to object to their being brought within the mortgage, on the ground that they were not corporate debts but were Johnson's individual liabilities, or on any other ground. Clearly he did not. He had bought the one-third interest in the property at a total fixed valuation, subject to a consolidated liability of $36,700. That is what his purchase of a margin meant in substance. It is true that it was a matter indifferent to him what debts composed the total of $36,700;

but also it was true that by the contract, and especially in view of this list in which these debts were expressly mentioned, Johnson had the right to put into the mortgage as liabilities of the corporations, whether they were so in fact or not, the debts now under consideration. He himself, in his testimony, emphatically so asserts; and counsel for appellee are mistaken, so far as these debts are concerned, when they insist in their argument that Millsaps had, by the September contract, reserved the right to determine what were corporate debts, and, in the execution of the mortgage, to repudiate all that were not such technically. As between him and Johnson, he was, *quoad hoc*, irrevocably bound to submit to these debts as if they were corporate liabilities; and so the matter was considered until the very end of the transaction. Neither Johnson nor his assignee can now, because of a change in circumstances which makes a different disposition of the status of those listed debts desirable, take a different stand in this regard.

There is another point of view. These debts were all incurred, as appears from the testimony, in Johnson's individual name, but for moneys actually used for the benefit of the respective corporations, and known by the creditors at the time to be intended for such use. Johnson was at that time, as well as at the time of his contract with Millsaps, the sole owner of those corporations. The fact that a single individual holds all the stock of a corporation does not, it is true, dissolve the corporation or vest in him the legal title to its property. He may contract in the corporate name, and thereby bind the corporation as such. His contracts made in his individual name, and where credit is extended to him in his individual capacity, may not impose a legal liability upon the corporation, even although the contract be for its benefit. Still, since every corporation is a trustee of its property, first for its creditors and afterwards for its stockholders, he has clearly an equitable title to the corporate property. He may charge it in equity, even for his individual debts

(*Louisville Banking Co.* v. *Eiseman*, 40 Am. & Eng. Corp.
Cases, 243, and note); and, under our statute, his equitable
interest is vendible even by execution at law.    Whatever, in
a case of the settlement of the affairs of an insolvent corpo-
ration, a court of chancery into whose hands such matters
may have come, would do under its rules of administration,
as between strictly corporate debts and the individual debts
of a sole owner, by way of marshalling, no such question
arises here.    So long as the concern remains in the hands of
the sole owner, and he holds all of the stock, the way is short
and easy for the appropriation of all the so-called corporate
property to the payment of his individual debts; and espe-
cially is it easy in a court of equity to a creditor who can
show that the money which he furnished to the owner went
into the creation of the corporate property pursued.    If such
sole owner shall transfer any of the stock to others, and
thereby revive the status of associated effort contemplated
by law in the creation of every corporation, the transferees
would, of course, have their rights, and would be protected
from all individual liabilities, except such as had been made
fixed charges.    So, here, Millsaps, after receiving his stock,
could, as a general rule, have successfully resisted any effort
of Johnson's individual creditors to subject the corporate
property to their debts.   But he could not have so success-
fully resisted these debts.    Their holders could have averred
that he purchased with express notification that their debts
were to be treated as corporate debts, and were to be charged
on the corporate property, and with a reduction made in the
purchase-price for that reason.    And to this claim he could
have made no answer.

The error which we think the court committed below was
in confining the investigation to the question of technical
and direct legal liabilities on the part of the corporations, as
distinguished from the individual but sole owner, Johnson;
whereas, the true point was the sum of those debts which,
by the entire contract, construed in the light of all the at-

tendant circumstances, were assertable against Millsaps as liabilities to be liquidated by the mortgage. Nor do we think that, under the contract made, Johnson had any right to call upon Millsaps to enter into a situation so doubtful as that here presented—so incumbered by probabilities of litigation and losses—all the results of Johnson's own dealings with his own affairs; nor, in this case particularly, can he or his assignee cast upon Millsaps the onus of disproving those liabilities to be corporate debts. Under the circumstances, that burden fairly belongs to the plaintiff.

We hold that the debt to Campbell & Starling should have been taken into consideration. That firm was employed by the Greenville Street Railway, by a resolution spread upon the minutes, at a salary of $250 per annum. This salary the consolidated company would have been liable to pay, and the fact that the attorneys have, at some time not fixed, and for some reason not given, written the charge off their books, does not alter the fact that it was a liability of the company on the twentieth of September, if, indeed, it be not a liabilty now.

The debt to the building and savings association of $4,853.35 was not a liability of any of the corporations, and cannot be taken into consideration unless it was a charge upon the property of the corporations or of one of them. It is claimed by the appellee that, while it was secured by a mortgage executed by Johnson upon the Belle Air lots, those lots themselves were not the property of any of the companies, but were the individual property of Johnson. They were first conveyed to one Negus, who was secretary of the Greenville Street Railway Company, for that company; but since it was thought that the company was not authorized to take title to lands, they were conveyed to him individually. For the same reason, when Johnson acquired the road, they were conveyed to him individually, and so holding them he executed a mortgage on them to secure the debt in question. It seems, however, that in the negotiation for the sale to

Millsaps these very lots were listed as assets of the company, or at least as items going into the total of assets, which, being diminished by the $36,700 of liabilities, left the margin bought and sold. Just as to exceed the $36,700 limit of liabilities would destroy that margin, so to diminish the assets from which those liabilities were to be paid would destroy it equally as effectually. The record does not show that Johnson warranted the assets to include these lots, and it does show that the valuation of $45,450 which was fixed by the parties was fixed as the gross value of the stock sold, not of the specific items of property which constituted the company's assets. But, also, the record shows that the defendant offered, in various forms, to prove that the lots in question were listed as assets forming the basis for the negotiation, and subjects of the "capitalization" spoken of in the writing of July, and that the court excluded the testimony. If such was the fact, the proof was competent, and should have been admitted; that is to say, if the pleadings had been so framed as to present that view. They were not so framed, but to meet that difficulty, and pending the trial, the defendant offered a plea, numbered the ninth, which the court refused to allow filed, on the ground that it was too late. We hold that the plea should have been filed. This was necessary, in order that the cause might be fairly tried on its merits. The court had ample power to impose such terms as should be just and equitable.

In respect to the debt of Miller, Alexander & Co. we hold that it was a corporate liability. Grant that the original consideration was extended to Johnson individually, still, in August, 1890, he had executed a corporation note for the debt. The road was his property solely. No stock, even, had been issued. No one had a right to complain except perhaps a creditor, under circumstances which do not here exist, and it does not appear that any one does complain. The note was executed for a consideration of work done for the benefit of the road, and for other work which constituted

a builder's lien on the Belle Air lots, in fact—although we do not think that here the nature of the consideration makes any difference. By Johnson's own act, therefore, he had, on the thirtieth of August, placed this $3,000 note of the corporation in the hands of his creditor, who had accepted it, and was holding it. That creditor could have asserted it as a debt whenever he saw fit, and doubtless would have done so whenever it should suit him. Nor do we think that the fact, if it be a fact, that the note was executed to the payees in order that they might raise money on it, and that they failed to do so, and laid it away, makes any difference. The note was not accommodation paper. It was given for a debt due, resting on a fully adequate consideration. The holder might neglect it or forget it, but he was armed with it, and it was a binding obligation.

The court below, we gather from the argument here, allowed this debt, but scaled it down to about $600, because of the admitted fact that after the twentieth of September and before the twentieth of November, the latter being the day appointed for the consolidation, Johnson had made payments to the payees, which, being credited, would reduce the note to that sum. But we hold that the computation must be made as of the twentieth day of September. That day was precisely fixed by the warranty. The parties selected their own time, and made their contract accordingly. In a case like this, the breach of the warranty cannot be subsequently repaired by him who broke it. Where goods are sold with warranty, if the warranty be broken, the purchaser has several methods of remedy. He may accept the goods, pay for them and sue on the warranty for the difference in value; or he may, having accepted the goods, refuse to pay for them in full, and recoup his damages against the seller's demand; or he may reject the goods, stand on his right to have them as warranted, and sue for his damages; or he may repudiate the sale *in toto*, if he has not received the goods or if he returned them in a reasonable time. Hare on Contracts, p. 554.

These rights are the purchaser's; the seller cannot control them or affect them. It is very true that the purchaser may, by his own conduct, lose his right to repudiate the purchase absolutely. But in the case at bar, we hold that he has not. On the twentieth of September, the appellant had received nothing under his contract—not even the stock certificates, which, when received, would have evidenced the right to one-third of such margin of value as there was. On that day, therefore, if it were true that no such margin as he bought existed, he had the right to choose his course; and we find nothing in the record which should deprive him of that option. His failure to examine the books cannot be imputed to him as a waiver, because he had the right to rely upon the express warranty.

For the reasons just stated, we hold that the replication numbered sixteen, filed in response to the fifth and eighth pleas, was bad, and that the demurrer of the defendant thereto should have been sustained.

The last point which we shall consider is the action of the court below upon the replication numbered seventeen. That replication asserts that the note sued on was executed by Millsaps "for the purpose of having the same negotiated by Johnson, who, in pursuance of said purpose, immediately on its execution," negotiated the note for value with the plaintiff. We hold that the replication was bad, and that the demurrer to it should have been sustained. Something more is needed to take a note from under the operation of our anti-commercial statute than a mere purpose that it shall be negotiated by the payee when executed. There must be a sinister design, creating an equitable estoppel. Mere knowledge that the payee will immediately discount, or even an intent that he shall do so, does not constitute such an estoppel. If it did, then the statute can have no operation as to a note made payable to order; for the very reason why such terms are used in a note is to make it negotiable even as at common law, and every person who utters such a paper must

be conclusively presumed to know that the same is put by his deliberate act in such shape as to be negotiable by the payee immediately. There can be no substantial difference between a present intent that such negotiation shall be made and an intent to put the paper in shape for negotiation .with knowledge that it may be immediately sold for value. The statute was enacted for the very purpose of covering such cases and opening the paper to equitable defenses notwithstanding.

The case of *Hawkins* v. *Neal,* 60 Miss., 256, does not militate against this view. There the note was accommodation paper. It was given as such, the maker well knowing at the time that there was no consideration for it as between himself and the payee, intending that it should be negotiated in the absence of such a consideration. It is well settled that paper of this class, well known· in the commercial law and in the world of business, is not in fact executed until it is delivered to the discounter or purchaser, and that his purchase constitutes the consideration. The cases are not alike· for that reason. *Tilden* v. *Blair,* 21 Wal., 241.

For the reasons stated, the judgment of the court below must be

*Reversed.*

HON. J. A. P. CAMPBELL, being disqualified by reason of interest, did not participate in this decision. Edward Mayes, Esq., a member of the bar, was, by consent, selected to sit in his stead.